## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| EDDIE LEE ROBINSON, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | **Case No. 09 C 3844** |
| ) | |
| AARON BANDY, MARCUS WIETTING, ) | |
| and CITY OF JOLIET, ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW  F. KENNELLY, District Judge:

*Pro se* plaintiff Eddie Lee Robinson has sued the City of Joliet and two Joliet

police officers, claiming that the officers arrested him without probable cause, caused

him to be subjected to excessive bail, and discriminated against him based on his race

(African American).[1]  Robinson has asserted three claims under 42 U.S.C. § 1983

against the officers and a *Monell* claim against the city.  All of the defendants now seek

summary judgment.  For the reasons stated below, the Court grants defendants' motion.

### Background

On a motion for summary judgment, the Court construes all facts favorably to the

nonmoving party and makes reasonable inferences in that party's favor.  *Eaton v. Ind.*

*Dep't of Corr.*, 657 F.3d 551, 552 (7th Cir. 2011).  The Court takes the following facts

from the parties' memoranda of law and statements of uncontested facts.

---

[1]The Court previously appointed counsel to represent Mr. Robinson but later (after significant discovery had been done) granted counsel's motion to withdraw based on disagreements over strategy and other factors.

In the early hours of June 26, 2007, Robinson and Cynthia Clarke attended a party at a friend's house in Joliet. After the party, Robinson drove Clarke to her apartment, where she invited him inside. When they arrived, Clarke's acquaintance Darryl Montgomery and Montgomery's friend Dwight Swarn were in Clarke's apartment. Clarke testified that at some point that evening, Montgomery asked Robinson if he had any drugs, and Robinson said he did not.

Clarke and Robinson eventually went into Clarke's bedroom. Robinson asked if he could stay the night, and Clarke said he could. Robinson and Clarke eventually went to sleep on opposite sides of Clarke's bed. Clarke was then awakened around 6 a.m. by Montgomery, who told her that while she was unconscious, Robinson had been lying on top of her and penetrating her sexually. Robinson denied this. Montgomery then called the police and reported a sexual assault.

After receiving word of Montgomery's call from the police dispatcher, Officer Aaron Bandy arrived at the scene, followed by Officer Marcus Wietting. Wietting was accompanied by Officer Jennifer O'Rourke, who at that time was still in training. The officers testified that they spoke to Montgomery, Swarn, and Clarke, each of whom stated essentially what Montgomery had earlier told Clarke. Clarke testified that she is unsure what, if anything, she said to the officers because she has difficulty remembering the incident. The officers also testified that when they spoke to Robinson, he first told them that he had not had any sexual contact with Clarke that evening and then said that there had been some consensual activity between them. The officers testified that they believed that both Clarke and Robinson were under the influence of alcohol.

Around 7 a.m., the officers placed Robinson under arrest, and Wietting and O'Rourke took him to the Joliet police station. Paramedics took Clarke in an ambulance to the hospital, where hospital personnel conducted a physical examination and administered a sexual assault kit. Bandy went to the hospital as well. Gina Reiter, a nurse who cared for Clarke at the hospital, testified that Clarke told her that she had been raped by Robinson and another man in Robinson's car while being driven away from the party. Reiter also testified that the doctor who examined Clarke noted no injuries or internal injuries and that she related all of this information to Bandy. Clarke testified that at some point she told doctors that she had not been raped.

Also around 7 a.m., another officer arrived at Clarke's apartment to look for evidence. The officer filed a report later that day saying that his examination of Clarke's bed "for any kind of seminal or body fluids . . . met with negative results." Pl. Ex. 3. The officer then went to the police station to take a DNA sample from Robinson. The sample, other materials taken from Clarke's apartment, and Clarke's sexual assault kit were sent to the police crime laboratory for further analysis.

Clarke testified that she soon began to have doubts about Montgomery's account of the incident. Soon after the arrest (the record does not indicate on which day), she went to the Joliet police station to attempt to retract her statement. She testified that she spoke with a person at the front desk and said that she did not believe Robinson had raped her, she had been drinking alcohol that night, and she had not been taking the medication she was prescribed after being diagnosed with schizophrenia. She testified that she did not speak to anyone else at the station and does not remember what the person with whom she spoke said to her.

On June 27, 2007, the day after he was arrested, Robinson appeared via video in Will County Circuit Court and was charged with criminal sexual assault, a class one felony. The court assigned the public defender to represent him. The assistant public defender who was present in court waived a *Gerstein* hearing and recommended that Robinson waive his right to a preliminary hearing, which Robinson did. Upon the prosecutor's recommendation, the court set Robinson's bond at $150,000. The court cited the seriousness of the charge and Robinson's criminal history, which according to the prosecutor included at least seven prior arrests, including one for aggravated assault in 2006, and six years of incarceration. The court then said that Robinson could "file a written motion asking me to reduce the bond with a specific bond amount in mind, but you would have to come up – it is a Class 1 Felony – with some substantial bond in order to justify me lowering it." Def. Ex. 8 at 5. Robinson testified that he could not see from the video camera whether any of the officers who arrested him were present at this hearing. The officers testified that they did not attend the hearing.

On October 12, 2007, the crime lab released a report stating that no bodily fluids were identified from Clarke's sexual assault kit and that there was "no analysis necessary" of Robinson's DNA sample. On October 18, 2007, upon a motion by Robinson's lawyer, the court reduced Robinson's bond to $75,000 and released him after his mother posted $7,500. On April 29, 2008, county prosecutors made a *nolle prosequi* motion in his case, and the case was dismissed.

Robinson filed this lawsuit on June 25, 2009. He initially also sued two county prosecutors, but the Court dismissed them based on the doctrine of absolute immunity. Robinson later attempted to add O'Rourke as a defendant, but the Court determined

4

that claims against her were time-barred.  Robinson also initially asserted state-law claims for malicious prosecution and intentional infliction of emotional distress, which he has since voluntarily dismissed.

Although the Court granted defendants' request for an extension of time to file a reply in support of their motion for summary judgment, they failed to submit a reply in the time allotted and did not seek an extension of time.  The Court has therefore ruled on the motion based on defendants' initial memorandum and Robinson's response.

**Discussion**

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999); Fed. R. Civ. P. 56(c).  A court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "The nonmoving party must offer something more than a 'scintilla' of evidence to overcome summary judgment . . . and must do more than 'simply show that there is some metaphysical doubt as to the material facts.'"  *Roger Whitmore's Auto. Servs. v. Lake County*, 424 F.3d 659, 667 (7th Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Robinson has asserted claims against the individual defendants under 42 U.S.C. § 1983 for false arrest, excessive bail, and violation of equal protection.  He has also sued the city under section 1983 based on his allegation that there is a pattern or practice of this type of police behavior.

Robinson has filed a "Motion to Stand on Verified First Amended Complaint," in which he asks the Court to consider a portion of his complaint along with his Local Rule 56.1 statement of facts.  By his signed declaration under penalty of perjury that the complaint is true, Robinson has "converted . . . those factual assertions in the complaint that '[are] made on personal knowledge [and] set forth such facts as would be admissible in evidence' . . . into an affidavit."  *Ford v. Wilson*, 90 F.3d 245, 247 (7th Cir. 1996) (quoting Fed. R. Civ. P. 56(e)).  The Court therefore grants Robinson's motion and will consider the assertions in the complaint that comply with Rule 56(e)'s requirements along with the other evidence Robinson has submitted.

## A.      False arrest and detention

In count one of his complaint, Robinson has asserted a claim under section 1983 that defendants violated his Fourth Amendment rights because "there was no probable cause or other lawful justification" for his "arrest and extensive detention."  Am. Compl. ¶ 32.

"The actual existence of *any* probable cause to arrest precludes a § 1983 suit for false arrest."  *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 762 (7th Cir. 2006) (emphasis in original).  "Probable cause to arrest requires an arresting officer to possess knowledge from reasonably trustworthy information that would lead a prudent person to believe that a suspect has committed a crime."  *United States v. McCauley*, 659 F.3d 645, 649 (7th Cir. 2011) (internal quotations and citation omitted).  Under Illinois law, a person commits the offense of criminal sexual assault, a felony, by "commit[ing] an act of sexual penetration [with] force or threat of force [or] know[ledge] that the victim is unable to understand the nature of the act or is unable to give knowing

6

consent." 720 ILCS 5/11-1.20(a)(1), (2).[2]

At the outset, the Court makes two observations. First, Robinson cites a wide variety of evidence in support of his contentions regarding probable cause. Much of this evidence, such as Clarke's later testimony that she does not believe Robinson raped her and the negative test results from the sexual assault kit, supports the proposition that no crime occurred. The probable cause inquiry, however, "depends on information known to the police at the time, not on how things turn out." *Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994). "[P]robable cause does not depend on the witness turning out to have been right; it's what the police know, not whether they know the truth, that matters." *Sow v. Fortville Police Dept.*, 636 F.3d 293, 302 (internal quotation marks and citation omitted).

Second, although defendants' motion refers primarily to the question of probable cause at the time of arrest, the complaint and the substance of Robinson's argument concern the circumstances of his arrest and his subsequent detention, each of which can support a Fourth Amendment claim. The Court will therefore consider whether a reasonable jury could find that the officers lacked probable cause based on the facts known to them, first, at the time of Robinson's arrest, and second, between his arrest and his first court appearance. *See Garcia v. City of Chicago*, 24 F.3d 966, 970 n.6 (7th Cir. 1994) (noting that the Fourth Amendment no longer governs a person's detention after a *Gerstein* hearing).

To establish probable cause, "[t]he officers must have more than a bare

---

[2]At the time of Robinson's arrest, this provision was codified at 720 ILCS 5/12-13(a).

suspicion that they have the right guy, but they need not have enough evidence to support a conviction or even to show that their belief is more likely true than false." *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010). "When an officer receives information from a third party whom it seems reasonable to believe is telling the truth, the officer has probable cause to effectuate an arrest." *Sow*, 636 F.3d at 302. The Seventh Circuit has found probable cause to arrest based on an officers' receipt of "questionable" and "uncorroborated citizen complaints." *Woods v. City of Chicago*, 234 F.3d 979, 997 (7th Cir. 2000).

Bandy, Wietting, and O'Rourke all related essentially the same sequence of events leading up to Robinson's arrest. According to the officers, Bandy arrived and spoke briefly to all four of the people in Clarke's apartment, then Wietting and O'Rourke arrived and were met by Montgomery. One or more officers then spoke to each of Montgomery, Swarn, Clarke, and Robinson. Montgomery and Swarn both stated that Swarn, while passing Clarke's room, saw Clarke unconscious and Robinson on top of her engaged in an act of sexual penetration. Swarn then brought Montgomery over to see, at which point Montgomery woke Clarke, pushed Robinson away, and called the police. The officers stated that Clarke said multiple times that Robinson had raped her. The officers also stated that Robinson initially said he and Clarke had not done anything but then changed his story to state that they had engaged in some consensual sexual activity.

Robinson maintains that the officers gave differing accounts of the events at the apartment and argues that these conflicts give rise to a genuine issue of material fact that precludes summary judgment. But "minor ambiguities . . . do not relieve the plaintiff

of the burden of presenting affirmative evidence to support [his] case." *Tom v. Voida*, 963 F.2d 952, 961 (7th Cir. 1992). Although the officers' accounts differ slightly regarding whom they spoke to and when, the differences do not amount to anything beyond minor ambiguities. More importantly, the substance of their testimony regarding what they heard and from whom is consistent.

Robinson asserts that the officers should not have believed anything Clarke said because Bandy testified that he was familiar with 911 calls from Clarke that indicated that she might not be reliable. Robinson also maintains that Clarke did not, in fact, tell the officers that she had been raped. Clarke's deposition contains varying descriptions of the events in question. She stated twice that she did not speak with any officers before being taken to the hospital. Clarke Dep. at 19:21-23, 54:6. On the other hand, she answered "no" to the question of whether she would "have any reason to dispute a female officer if she said she spoke to you about this case that morning at your residence," saying, "[i]t probably is that I just don't recall." *Id*. at 52:18-24. Later in her deposition, she indicated that she did not fully recall the incident, she had been under the influence of alcohol and had failed to take her medication, and "most likely, [she] probably did tell an officer" that she awoke to find Robinson on top of her. *Id*. at 62:11-16.

Even assuming that Clarke said nothing to the officers or they did not find her statements credible, Robinson has not presented any evidence indicating that Montgomery and Swarn did not relate to the officers what the officers claim they said. Instead, Robinson argues that Montgomery and Swarn were insufficiently reliable, primarily because he claims they had been drinking or using drugs. When Wietting was

9

asked if Montgomery had appeared intoxicated, he said, "I believe everybody involved

had been drinking." Wietting Dep. at 9:5-7. A reasonable jury could construe this as an

admission that Montgomery was visibly under the influence of alcohol. Wietting then

stated, however, that Montgomery did not appear to be under the influence of anything

else. Although Robinson claims that Montgomery and Swarn had used other drugs that

evening, there is no evidence from which a reasonable could find that this or the

influence of alcohol was reflected in their demeanor to such a degree that it was

"[un]reasonable to believe [they were] telling the truth," *see Sow*, 636 F.3d at 302,

particularly in light of the fact that they both told the officers essentially the same thing.

"[I]n crediting the complaint of a reasonably believable witness or putative victim,

the police are under no constitutional obligation to exclude all suggestions that the

witness or victim is not telling the truth." *Beauchamp v. City of Noblesville*, 320 F.3d

733, 743 (7th Cir. 2003); *see also Pasiewicz v. Lake County Forest Preserve Dist.*, 270

F.3d 520, 525 (7th Cir. 2001) (finding probable cause when "there was no indication that

the [eyewitnesses] were lying, or that their information otherwise was not credible or

accurate"); *Spiegel v. Cortese*, 196 F.3d 717, 725 (7th Cir. 1999) ("The credibility of a

putative victim or witness is a question, not for the police officers in the discharge of

their considerable duties, but for the jury in a criminal trial."). Although a reasonable jury

could find from the evidence that Montgomery and Swarn had been drinking and were

in an excited state, there is nothing to indicate that they were incoherent, seriously

inconsistent, or otherwise obviously lying.[3] *See Spiegel*, 196 F.3d at 725 ("We refuse to

---

[3]During Bandy's deposition, he was shown a "call log" that was prepared by the police

(continued...)

require law enforcement officers to delay arresting a suspect until after they have conclusively resolved each and every inconsistency or contradiction in a victim's account.").

Moreover, "a report of questionable reliability" does not obligate an officer to discount the report entirely, only to "investigate" before relying on it in order to arrest. *See Hebron*, 18 F.3d at 423. In this case, the officers did not rely only on the 911 call or on what Montgomery initially told Wietting and O'Rourke outside the house. They followed up by talking again to Montgomery, talking to Swarn, who gave the same story, and talking to Robinson, who gave inconsistent explanations (and who has admitted that he does not recall much of the incident because he was also under the influence of alcohol). The officers were entitled to find that Montgomery and Swarn's account of the events were "more credible than [Robinson's] denial," *Reynolds v. Jamison*, 488 F.3d 756, 762 (7th Cir. 2007), and there is no evidence that they did not come to this conclusion at the time. In any event, Robinson admitted prior to his arrest having had sexual contact with Clarke, and it was reasonable for the officers to take his shifting account as evidence of his guilt. *Fox*, 600 F.3d at 836. The Court concludes that the statements by Montgomery and Swarn provided the officers with probable cause to arrest Robinson.

---

[3](...continued)
dispatcher, describing Montgomery's 911 call. Bandy testified that the log contained a code indicating that someone believed that Montgomery "might be crazy." Bandy Dep. at 17:18-19. Bandy testified, however, that he had not seen the document before his deposition and did not know who determined that the call merited the code. There is no indication that Bandy had access to this information while at Clarke's apartment, and, as the Court has explained, no indication that Montgomery's behavior when he spoke to the officers rendered him obviously untrustworthy.

The Court's consideration of the existence of probable cause, however, does not end as of the moment Robinson was arrested. "The continuation of even a lawful arrest violates the Fourth Amendment when the police discover additional facts dissipating their earlier probable cause." *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986). In *BeVier*, the Seventh Circuit considered the case of a couple arrested for child neglect. The court concluded that probable cause had dissipated when an "experienced investigator of child abuse and neglect for the DCFS" told a police officer that the circumstances he described "did not appear to be a violation of the child neglect statute." *Id*. The court also cited a case in which confirmation from a landlord that a defendant lived in an apartment removed probable cause to believe that the defendant had attempted burglary. *Id*. (citing *People v. Quarles*, 88 Ill. App. 3d 340, 410 N.E.2d 497 (1980)).

The evidence Robinson cites that might be considered to have had some effect on the officers' probable cause finding includes Clarke's statement that she had been diagnosed with schizophrenia, the fact that she stated at the hospital that she had not been raped and then said that she had been raped in a car rather than in the apartment, and the fact that the doctor who examined her failed to find injury. Robinson also cites the fact that the officer who examined Clarke's apartment for physical evidence filed a report on June 26 saying that he had not found any. Finally, Clarke went to the police station to attempt to retract her story.

The record does not clearly show on which day Clarke went to the station, and it therefore allows for the inference in Robinson's favor that this occurred later on the day of his arrest. There is no indication, however, that the information that Clarke attempted

to give at the police station ever reached Bandy or Wietting. Neither officer stated that he knew about it. Clarke testified that she did not remember with whom she spoke and that she did not believe she spoke with anyone other than the officer at the front desk. Clarke Dep. at 26:19-27:5. Robinson asserts that "the police officers at the station refused to allow" Clarke to retract her story, but Clarke's testimony (including the portion Robinson cites in support of this assertion) was only that she could not remember what the officer at the station said to her. Pl.'s L.R. 56.1 Stmt. ¶ 34; Clarke Dep. at 27:8, 94:5. There is no evidence from which a reasonable jury could find that Bandy or Wietting were aware that Clarke had come to the station to say that she did not believe that Robinson raped her.

Assuming that Bandy and/or Wietting knew of the remaining evidence that Robinson cites – that Clarke was schizophrenic and had given varying and uncertain accounts at the hospital, that she did not exhibit any signs of injury, and that no physical evidence was immediately visible at the scene – the Court nonetheless concludes that this was not enough to obviate probable cause. None of the evidence is inconsistent with the possibility that Montgomery and Swarn were telling the truth. Bandy's knowledge of Clarke's mental illness and reputation for unreliability would support, rather than negate, a conclusion that he should rely on the statements from the other witnesses at the scene. Clarke's statement to Reiter that she was raped in a car, while inconsistent with what the officers had previously heard, still indicated that Robinson had raped her. Robinson was alleged to have committed sexual assault while Clarke was unconscious, rather than through violence, which could explain the absence of visible physical injury. Finally, a lack of visible physical evidence at the scene in no way

13

indicated that evidence would not be discovered later through testing or from the sexual assault kit.

The Court concludes that there is no evidence from which a reasonable jury could find that facts within Bandy and Wietting's knowledge dissipated the existence of probable cause prior to the time of Robinson's initial court hearing. Thus, there is no evidence from which a reasonable jury could find that his arrest or his detention violated the Fourth Amendment.

For these reasons, the Court grants summary judgment in favor of Bandy and Wietting on count one.

## B. Excessive bail

In count two of Robinson's complaint, he asserts that the officers failed to disclose "exculpatory information" to prosecutors, thereby causing him to be subject to excessive bail in violation of the Eighth Amendment. He admits that he has no evidence that the officers recommended a particular bail amount. Robinson Dep. at 23:4-14. His argument is essentially that if Bandy's police report had included all the information described in the previous section, in particular regarding Clarke's conflicting testimony from the hospital and the results of her initial physical examination, the prosecutors would have had no cause to charge Robinson with a crime, and he therefore would not have been subject to any bail at all.

Defendants correctly argue that this claim fails because Robinson has provided no evidence that the officers were involved in the decision to set his bail. *See Ester v. Bonar*, No. 98-1216, 1999 WL 332715, at *1 (7th Cir. May 24, 1999) (affirming grant of summary judgment for police officer when there was no evidence of personal

14

involvement in setting bail); *see also United States v. Giangrosso*, 763 F.2d 849, 851

(7th Cir. 1985) ("The prohibition of excessive bail . . . means simply 'that bail shall not

be excessive in those cases where it is proper to grant bail.'") (quoting *Carlson v.*

*Landon*, 342 U.S. 524, 545-46 (1952)).  In addition, Robinson has offered no evidence

from which a reasonable jury could find that the officers had any influence over the

judge's bail determination.  *See, e.g.*, *Green v. Mayfield*, No. 3:08-CV-2297, 2009 WL

230161, at *3 (N.D. Tex. Jan. 29, 2009) ("[S]etting the amount of bail is purely a

discretionary judicial function."); *Smith v. Scott County Jail*, No. 1:06-CV-145, 2007 WL

586801, at *2 (E.D. Mo. Feb. 21, 2007); *Ferebee v. Smith*, No. CIV 04-5123, 2006 WL

3423903, at *12 (D.S.D. Nov. 28, 2006) ("Plaintiff has not presented evidence that

[arresting officer] had any part in the magistrate's decision regarding bond after the

Plaintiff's arrest.").

      For these reasons, the Court grants summary judgment in favor of Bandy and

Wietting on count two.

## C.    Equal protection

      In count three of his complaint, Robinson asserts that the officers intentionally

discriminated against him on the basis of his race and socioeconomic status, in violation

of his Fourteenth Amendment right to equal protection.  Robinson argues that Bandy

and Wietting failed to comply with police department orders governing follow-up

investigations and the treatment of evidence before trial, thereby denying him rights

"accorded to similar arrestees."  Pl.'s Resp. at 18.  He argues further that defendants

must have discriminated because they "cannot point to any information in the record to

show that they equally use statements from known mentally disturbed individuals to

commence and continue a criminal prosecution proceedings [sic] against a non-African American male arrestee accused of committing . . . sexual assault." *Id*. at 19.

The Seventh Circuit has stated that plaintiffs seeking relief under section 1983 for a denial of equal protection must "prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Chavez v. Illinois State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001). The court has also stated that plaintiffs may succeed on such a claim if they "come forward with evidence from which a jury could conclude (1) they were members of a protected class; (2) they were similarly situated to members of an unprotected class in all relevant respects; and (3) they were treated differently from members of the unprotected class." *Harvey v. Town of Merrillville*, 649 F.3d 526, 531 (7th Cir. 2011). Robinson has not produced evidence from which a reasonable jury could find that he has satisfied either standard.

Robinson essentially admits that he has no direct evidence that the officers were motivated by a discriminatory purpose. His deposition contains the following exchange:

Q: How would Officers Bandy and Wietting know what your socioeconomic class status was?

A: I have no idea.

Q: Do you think they knew what it was?

A: Perhaps.

Q: How would they know that?

A: I have no idea.

Q: So this is an assumption on your part that they knew what your economic status was at the time of the arrest?

A: Yeah.

Q: You're not basing it on any evidence or any statements or actions that they took on that morning other than the simple fact you got arrested?

A: Well, like I said, that's what I think.

Q: Okay. What actions lead you to believe they discriminated against you based on your racial nationality?

A: Because I was Afro American. Black.

Q: Did they make any statements that would lead you to believe they arrested you based on that?

A: I couldn't hear what they were saying and couldn't figure it out so, you know, I mean maybe they did.

Q: Are you aware of any actions they took that morning that would lead you to believe that they took action based on your race other than the simple fact that you were arrested?

A: Yeah.

Q: What actions were those?

A: I mean they – well, they arrested me for it and I didn't do it. I mean . . .

Q: So the fact that you were arrested and the fact that you are African American, that's the basis for why they discriminated against you are those two factors combined?

A: I think so.

Robinson Dep. 80:8-81:22. The Court concludes that Robinson has offered no direct evidence of discrimination.

The sole piece of evidence Robinson offers to support his contention that similarly situated individuals were treated differently is a list of names of people arrested by the Joliet Police Department under suspicion of criminal sexual assault. Robinson argues that defendants have "not made a part of the record any facts to show that [those individuals] were treated in the same manner as" Robinson. Pl.'s Resp. to Def.'s

L.R. 56.1 Stmt. ¶ 38.  This, like the contention in Robinson's brief that defendants "have

not pointed to any information in the record to suggest that defendants did not

intentionally deprive Plaintiff Robinson of his rights to equal protection of the laws," Pl.'s

Resp. at 19, confuses the standard for summary judgment.  At this stage of the case, it

is Robinson who is required to offer "support for [his] allegations" in the form of

evidence.  *Mosley v. City of Chicago*, 614 F.3d 391, 400 (7th Cir. 2010).  He has not

done so.  Robinson's contention appears to be that the other individuals arrested in

Joliet were of a different race or socioeconomic status than he is and were therefore

treated differently, but he offers no evidence whatsoever regarding the race,

socioeconomic status, or treatment of anyone on the list.

In an equal protection case, the "plaintiff bears the burden of proof on the

constitutional deprivation that underlies the claim, and thus must come forward with

sufficient evidence to create genuine issues of material fact to avoid summary

judgment."  *Harvey*, 649 F.3d at 530 (internal quotation marks and citation omitted).

Robinson has not met this burden.  The Court therefore grants summary judgment in

favor of Bandy and Wietting on count three.

**D.     *Monell* claim**

If a municipality's policies lead to a violation of a plaintiff's constitutional rights,

the plaintiff may hold the municipality itself liable under section 1983.  *Monell v. Dep't of*

*Social Servs. of the City of New York*, 436 U.S. 658, 694-95 (1978).  When there is no

underlying constitutional violation, however, there can be no liability on the part of the

municipality.  *Tesch v. County of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998).

"[N]either *Monell* . . . nor any other [case] authorizes the award of damages against a

municipal corporation based on the actions of one of its officers when . . . the officer inflicted no constitutional harm." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

Because the Court has concluded that no reasonable jury could find that Bandy and Wietting violated Robinson's constitutional rights, Robinson's *Monell* claim fails as well. The Court therefore grants summary judgment in favor of the City of Joliet on count six of Robinson's complaint.

## Conclusion

For the reasons stated above, the Court grants plaintiff's motion to stand on his verified complaint [docket no. 91] and defendants' motion for summary judgment [docket no. 74]. Plaintiff's remaining motions are terminated as moot [docket nos. 106 & 107]. The Clerk is directed to enter judgment in favor of defendants.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 22, 2012